18773

Hubert DIXON, as Administrator of the Estate of Pearl Dixon, Respondent, v. WEIR FUEL COMPANY, Appellant-Respondent, and A. Jack Roberts, as Administrator of the Estate of David Roberts, Appellant.

(160 S. E. (2d) 194)

*Messrs. Gregory & Gregory,* of Lancaster, and *Roddey, Sumwalt & Carpenter,* of Rock Hill, *for Appellant, Weir Fuel Company,*

*Messrs. James H. Howey* and *Williams & Parler,* of Lancaster, and *D. Reece Williams, III,* of Columbia, *for Appellant, A. Jack Roberts, Administrator,*

*Messrs. Gregory & Gregory,* of Lancaster, and *Roddy, Sumwalt & Carpenter,* of Rock Hill, *for Respondent, Weir*

*Fuel Company,*

*Messrs. D. Glenn Yarborough* and *Berry L. Mobley,* of Lancaster, *for Respondent, Hubert Dixon, as Administrator of the Estate of Pearl Dixon, Deceased,*

March 14, 1968.

LITTLEJOHN, Justice.

In the early evening (after dark) of October 30, 1964, David Roberts and Pearl Dixon were killed when the automobile of Roberts, in which she as guest passenger and he as driver were riding, was in collision with a tractor-trailer truck operated by an agent or servant of Weir Fuel Company. For brevity we shall refer to these parties as Roberts, Dixon and Weir. The fatal collision occurred on U. S. Highway 21 about five miles north of Great Falls, South Carolina, at a combination filling station, restáurant and dance hall business known as Catawba Truck Stop. The highway in front of the truck stop is straight and runs in a general northwesterly and southeasterly direction, but for convenience we shall refer to it as running simply north and south.

The complaint is brought by Dixon's administrator in behalf of her statutory beneficiaries to recover damages for alleged wrongful death. Recovery is sought against both

Weir and the administrator of Roberts, who is sued in his capacity as general administrator. The complaint alleges that Dixon's death was proximately caused by the negligence, wantonness and wilfulness of Weir in driving the truck at an unlawful speed, in failing to keep a proper lookout, in failing to keep the truck under proper control, in driving on the left side of the road; it further alleges joint and concurrent negligence, wantonness and wilfulness on the part of her host driver, Roberts, as a proximate cause of her death, in driving under the influence of alcohol, in failing to keep a proper lookout, and in failing to take proper precaution for her as a passenger.

The answer of Roberts sets forth a general denial and alleges that Dixon's death was caused solely by the wrongful driving of Weir's agent. It further alleges contributory negligence and recklessness against Dixon in riding with Roberts, knowing that he was under the influence of alcohol, and being under the influence of alcohol herself. Roberts' answer continues by alleging a cross action against Weir, asking damages for Roberts' statutory beneficiaries, and alleging against Weir basically the same delicts set forth in Dixon's complaint against Weir.

The answer of Weir states a general denial, blames Roberts, and alleges contributory negligence, wantonness and wilfulness on the part of Dixon and Roberts as a defense to both claims, it being alleged that Roberts, while in an intoxicated condition wrongfully failed to yield the right-of-way, drove his automobile from a parked position on the truck stop property directly into the path of the oncoming truck, and that he failed to keep a proper lookout. The answer alleges that Dixon was contributorily negligent in voluntarily riding as a passenger with Roberts, knowing that he was grossly intoxicated.

Weir made timely motions for nonsuits and directed verdicts as to the claims of both Dixon and Roberts, which motions were denied. The jury returned a verdict for $25,-000.00 actual damages against Weir only in favor of Dixon,

and returned a verdict for $25,000.00 actual damage against Weir in favor of Roberts in the cross action.

Motions for judgment *non obstante veredicto* were made as to each verdict. The verdict in favor of Roberts was vacated. The motion as to Dixon was overruled and the verdict was permitted to stand.

Weir appeals, submitting that the trial judge should have set aside the verdict in the Dixon action also; and Roberts appeals, contending that the trial judge erred in setting aside the verdict for Roberts in the cross action.

In considering whether a judgment *non obstante veredicto* should be granted, all of the evidence together with the inferences reasonably deducible therefrom have to be taken most strongly against Weir and viewed in the light most favorable to both Dixon and Roberts.

There were two basic questions before the trial judge at the post-verdict stage, and both questions are similarly before this court.

The first question: Is there evidence of actionable negligence on the part of Weir's driver in the operation of the truck? Inasmuch as the appeal will be decided on other grounds we shall not dwell at length on this point. It is sufficient to say that we think the evidence, at least as to speed, is adequate to create a jury issue as to actionable negligence against the truck driver, and if this were the only issue involved both verdicts should stand.

The second question is: Were Dixon and/or Roberts guilty of contributory negligence as a matter of law?

In the trial of the case diagrams were drawn on blackboards and taken to the jury room. Unfortunately these diagrams are not available to this court but several photographs were introduced into evidence and have been helpful. Evidence of most distances were approximations. The absence of plats makes the facts somewhat difficult to reconstruct.

The truck stop is set back from the highway a sufficient distance to provide an island for gas pumps and service area on each side thereof. There is a paved apron in front of the establishment parallel with the highway for a distance estimated by the proprietor as being 90 feet. The entrance to the business was estimated to front 200 to 300 feet on the highway. A driveway extends completely around the building. To the north of the truck stop there is a residence occupied by the proprietor and his wife. It is set back somewhat from the highway a distance variously estimated to be 25, 30, 35 and 40 yards north of the truck stop. The highway is straight and visibility was good in both directions at the time of the accident.

The Weir truck was traveling from north to south, which would place the truck stop on Weir's right side.

Dixon and Roberts argue that the evidence is susceptible of the inference that Roberts entered the highway at or near the south end of the truck stop property entrance a safe distance from the approaching truck and had proceeded along Highway 21 on the right side thereof for some distance when the Weir truck wrongfully turned into its wrong (left) side of the road, striking the Roberts car head-on. If the evidence were susceptible of such inferences, the verdict would have to stand because the jury would be justified in finding that Roberts' conduct was not the proximate cause of the accident.

Weir contends that Roberts, while under the influence of alcohol, suddenly entered the highway at or near the northern entrance to the business property, creating a sudden emergency for the truck driver and that he swerved his truck to the left in an unsuccessful effort to avoid hitting the car of Roberts. Weir alleges that Dixon knew of Roberts' intoxicated condition when she got in his car.

Accordingly, three important factual issues are raised. First: Was Roberts driving under the influence and if so, did Dixon know of his condition? Second: from what point did the Roberts car enter the highway? and Third: at what point did the impact occur?

Dixon, Roberts and Weir all allege in the pleadings that Roberts was driving under the influence. This being true, proof was not required. However, proof was supplied to the exclusion of all other reasonable inferences and it is inescapable that Roberts, while under the influence, negligently drove his car into the highway when the well lighted truck was obviously so closely approaching as to constitute an immediate hazard, and when it could be clearly and easily seen. Under the facts, Roberts was required by common prudence and by Section 46-424, Code of 1962, to yield the right-of-way. His negligent conduct in the face of an obvious hazard was beyond question a proximate cause of the collision.

Roberts' administrator, in proof of his own allegations (of contributory negligence against Dixon) that his intestate was under the influence and that such fact was known to Dixon when she entered his car, presented witness Mobley, who testified that she and Shirley Parchner with Dixon and Roberts left the truck stop near four o'clock and drove to Great Falls, some five miles away, to get a fifth of liquor. She testified that Roberts was already so drunk that they persuaded Mrs. Dixon, who was also drinking, but less, to drive the car from Great Falls back to the truck stop. The drinking at the truck stop continued through the rest of the late afternoon and until just before the fatal collision. about 6:45 P. M. Referring to the time just before Roberts (with Dixon) left the building to get in his car, Roberts' witness Benton, who had known Roberts five or six years and worked on the same shift with him, testified:

"I wouldn't say he was drunk." * * * "I wouldn't want to be a passenger in his car." * * * "I asked him again going out the door, I said, 'Dave let me take you home', and he said, 'No, I got my car keys now. I am going to live it up tonight'. He had his cup up like that (indicating). That is the last words he said to me as he went around the corner."

Mrs. Pauline Small, a witness for Dixon, testified that when Dixon and Roberts came to the truck stop about four

o'clock they were sober. When she left it about six o'clock (which was about forty-five minutes before the collision), she testified they were definitely not drunk. She did not see them during the last 45 minutes before the accident.

Mr. Irby Wayne Small, who operated the business, testified that he came to work about five o'clock, but had no particular reason to pay attention to them, and at that time would say they were sober. Referring to the time just before the collision, he was asked: "in your opinion were they drunk or sober." His answer was: "no sir, they weren't drunk." It is significant that this witness testified that they were drinking both before they went to Great Falls and after they returned. At the time of their departure he does not testify that they were sober but does testify that they were not drunk.

It is well settled that one may be under the influence as contemplated by the traffic laws without being drunk or passed out, or even intoxicated. One violates the traffic statute if he partakes of alcohol to the extent that he cannot drive a motor vehicle with reasonable care, or if he cannot drive as a prudent driver would operate a vehicle. So the question is not: was Roberts drunk or intoxicated? The question is: was his condition such that he could drive with due regard for others (and we might add, for himself)? If not, he breached his statutory as well as his common law duty.

Dixon had been with Roberts for hours and well knew his condition, and in voluntarily riding with him was as a matter of law guilty of contributory negligence. Witness Mobley tried to persuade her to remain at the truck stop because Roberts was too drunk to drive but she refused to stay. Independent of his own pleadings, by which he was bound, as held by Judge Spruill, the evidence establishes as a matter of law that Roberts was driving under the influence at the time of the collision. See *Elrod v. All,* 243 S. C. 425, 134 S. E. (2d) 410.

In spite of this, Dixon and/or Roberts might recover if there is evidence to create an inference that the Roberts ve-

hicle had entered the highway at or near the south end of the truck stop, a safe distance from the approaching truck, and was proceeding in its northerly direction on its proper side of the road. All of the witnesses testified that the two vehicles, after the impact, came to rest approximately directly in front of the filling station. The entrance to the business was estimated to be 200 to 300 feet in width. The photographs bear this out and a truck stop could hardly exist with less frontage.

The impact occurred at a point described in the evidence as "dug-out places" at the northern entrance. The patrolman testified that it was 79 feet from such dug-out place to the place where the vehicles came to rest. The only reasonable inference to be drawn from the whole of the testimony is that the collision occurred at or near the north entrance to the truck stop in the vicinity of the mail box, and counsel did not attempt to place it north of that point.

Counsel for Dixon, in cross-examining witness Benton, said: "I believe, sir, there is no question but that the accident happened at the north end toward Fort Lawn." To this the answer was: "Yes sir." Witness Reverend Arthur Jack Roberts for Roberts corroborated this when he stated that the dug-out place was approximately six feet from the north entrance, on the north side of the entrance.

No witness saw the Roberts car leave its parking place on the south end of the building. No witness can trace its course to the point of impact. Weir's driver, Broughten, is the only living eyewitness to the wreck. He testified that the car was parked at the northern entrance with its lights off as he approached in the 27,500 pound truck at a speed of about 55 miles per hour. He stated that when he was about 50 feet from the car its lights came on and it suddenly entered the roadway at an angle. He swore that he applied maximum brakes and he "whipped it to the left to try to miss him", but struck the car at an angle on the left front fender, and pushed it back to the ditch on the opposite side of the road.

It is significant that Judge Spruill, who had the benefit of the blackboards and diagrams not available to this court, stated in his order, it obviously being beyond contest, that the collision "* * * was almost immediately in front of the Catawba Truck Stop * * *." He also stated: "Mr. Roberts and Mrs. Dixon had been at the Catawba Truck Stop *and were entering the highway* with the apparent intention of proceeding in a northerly direction toward Fort Lawn".

The pictures in evidence and the testimony verify that when these vehicles came to rest the front end of the truck was on top of the Ford. No impact is indicated to the right front end. Plaintiff's exhibit 7 shows the right front wheel and the left rear wheel intact, whereas the rest of the car is completely demolished; this is consistent with the testimony of Broughten that the car was hit on left front at an angle and that the front end of the truck came to rest on top of the Ford. The car was pushed back 79 feet, which is completely consistent with Broughten's testimony and with the defendant Weir's contention that the Ford was hit on its left front corner at an angle.

Patrolman Fowler who made the investigation testified that the Ford was hit at an angle, that "the car was angling across," that "it was not fully a head-on," but "it was hit at an angle." Such testimony was permitted without objection.

That the Roberts car had not completed its entrance to the highway and was not in its own lane of traffic is borne out by the testimony of witness Thomas Price who had been following the truck for some distance. He was a witness for Dixon; he testified that he was looking at the truck and it "Looked like he was trying to dodge something", and testified that he never saw any headlights on a vehicle meeting the truck. Here is positive testimony of Dixon's own witness who was looking at the place where the car is alleged to have been that the car was not in its own lane. This supports the testimony of truck driver Broughten, who said the car was going across the road, and accordingly the

lights would have been shining on the ditch bank on the other side of the road, and not up the road so that Price could see them.

The statement of Mr. Small that the collision occurred 200 feet north of the northern entrance was corrected by him to be around 200 feet north of his place of business. Upon further questioning he said it was angled off from the ·corner of his property. The testimony of Mrs. Small that the north end of the skid marks were some distance from the residence is purely conjectural and is inconsistent with the photographs and the skid marks shown therein.

The testimony of the two witnesses in the dance hall and of Mrs. Small in her residence next door to the effect that they did not see the car going around the building creates only conjecture and does not support the inference that the car left the truck stop at the south end of the paved area.

Roberts' administrator is placed in the unusual predicament of needing to show that his intestate was driving under the influence in order to defend against Dixon, and in needing to show that his intestate was not under the influence in order to sue Weir. Unfortunately for him, he had to take the facts as they came to him. He pursued the only honorable course, which was to, allege the facts as he found them to be from his investigation.

We conclude that the only reasonable inference to be drawn from the whole of the evidence is that Roberts failed to yield the right-of-way while driving under the influence, which condition was known to Dixon before she volunteered to ride with him; and that the conduct of each was a proximate cause of the deaths and both claims are barred by contributory negligence.

Let judgment be entered for Weir in both claims

Affirmed in part; Reversed in part.

Moss, C. J., concurs.

BRAILSFORD, J., concurs in result.

BUSSEY and LEWIS, JJ., dissent.

BRAILSFORD, Justice (concurring):

I agree with Justice Littlejohn that the only reasonable inference from the evidence is that the Weir truck was in such close proximity to the point at which Roberts entered the highway that the latter was required by Section 46-424, Code of 1962, and by common prudence, to yield the right-of-way. His reckless breach of this duty, in the face of such an obvious hazard, was, inescapably, a proximate cause of the collision. I am also convinced that the only reasonable inference from the evidence is that Roberts and Dixon were under the influence of intoxicating liquor at the time, and that she, knowing of his condition, was guilty of contributory negligence and recklessness in voluntarily riding with him. I, therefore, concur in the opinion of Justice Littlejohn.

Moss, C. J., concurs.

BUSSEY, Justice (dissenting):

Not being in accord with the opinion of Mr. Justice Littlejohn, which I shall hereafter refer to, simply as the opinion, I most respectfully dissent. I disagree not only with his analysis of the evidence in several particulars, and the inferences that he draws therefrom, but with legal propositions stated and/or inherent in the opinion.

For the purposes of this dissent, I shall assume that both Dixon and Roberts were under the influence of intoxicating liquors and that Dixon knew of Roberts' condition. The question still remains whether such misconduct in this respect was a contributing proximate cause of the collision and resultant death of these two parties.

The point of impact between the vehicles is rather clearly established as being on Roberts' side of the highway, four feet two inches from the center line, and at a point to the north of the northern entrance or driveway to the truck stop. A cardinal factual issue in the case, bearing on the issue of proximate cause, is precisely how far north of this driveway the impact occurred. No plat or diagram is in the

record throwing any light on this particular point. While the photographs clearly show all the physical evidence of the impact to be in Roberts' lane of travel, they throw little, if any, light on the cardinal question of how far north of the driveway the impact occurred, since all photographs were taken either looking north or south on the highway. For the most part, witnesses, as to this precise point estimated distances and some of the key witnesses testified in conjunction with diagrams drawn on blackboards, with the result that much of their testimony is far from intelligible in the absence of such diagrams.

Some time after the jury had retired for deliberation, the court was requested by the jury to allow it to have the blackboards containing these diagrams in the jury room, and, with the permission of all counsel, the court granted the request. A reasonable inference is that the jury needed these diagrams to enable it to understand the testimony of the witnesses and to determine what is here the issue, proximate cause. Under these circumstances, the diagrams, I think, in effect became a part of the evidence in the case, although they were not formally introduced as such.

The rule of law under which this court occasionally decides, as a matter of law, what is normally a jury issue clearly contemplates, I think, that this court have before it all of the evidence before attempting to decide that the evidence is susceptible of only one reasonable inference.

The foregoing alone should require a different result than that reached in the opinion. Aside therefrom, however, considering only the evidence which is in the record, there is, in my view, clearly more than one reasonable inference on the issue of proximate cause.

It is well established that if inferences reasonably deducible from the evidence are doubtful or if they tend to show both parties guilty of negligence or willfulness, and there may be a fair difference of opinion as to whose act produced the injury complained of, proximate cause is for the jury and not for the court. See cases collected in West's South Carolina Digest, Negligence, 136(25).

Broughten, the driver of the Weir vehicle, contended that he was approximately fifty feet from the northern driveway when Roberts' vehicle emerged therefrom and that he had to swerve across the highway in an effort to avoid the collision. While Broughten contends a somewhat lower speed, there was evidence that he was proceeding at a rate as high as sixty-five miles an hour, in approaching the truck stop where he knew there was a lot of in and out traffic on Friday night. Contrary to his contention, as will be hereinafter pointed out, there is evidence tending to prove that the point of impact was approximately one hundred feet north of the driveway and that to the north of the point of impact skid marks to the extent of fifty-six feet were laid down by the Weir vehicle in Roberts' lane of travel. Additionally, Broughten testified that at a speed of forty-five miles an hour it would take thirty-five or more feet for the brakes to take effect after application. When we consider Broughten's reaction time and the collective distances above mentioned, it would seem obvious that Broughten was occupying Roberts' lane of travel for at least two hundred feet before he got to the driveway entrance.

There is, in my view, nothing conjectural about the testimony of Mrs. Small who went out the next morning and looked at the skid marks and the gouged out places in the pavement indicating the point of impact, and testified that the skid marks were to the north of the residence, which is located on a lot to the north of the truck stop property. Her testimony would fix the point of impact, at least inferentially, some one hundred feet north of the northern driveway. The testimony of Mr. Small even as corrected on cross-examination viewed in the light most favorable to the decedents, likewise placed the point of the collision as being approximately one hundred feet north of the driveway entrance. The testimony of both Mr. and Mrs. Small is consistent with the testimony of the highway patrolman who testified that the point of impact was to the north of the driveway; that the vehicles came to rest on the east bank of the highway after the collision, "approximately right across

from the north driveway", and that the distance from the point of impact to where the vehicles came to rest was measured at some seventy-nine feet.

When Roberts started to leave the truck stop his car was parked on the south side of the building, headed directly into the side of the building. He could, of course, have driven around the rear of the building and come out of the north driveway, as contended by Weir. Three witnesses were in position to see him go around the rear of the building and come out on the north, if he had done so, and none of them saw him. While the testimony of these witnesses does not establish the precise point at which Roberts did enter the highway, in my view, such evidence creates a reasonable inference that Roberts did not come around the building and out of the north driveway, as contended by Weir, but that he logically entered the highway at least some distance south of the driveway.

Even if it be assumed that Roberts entered the highway from the northern driveway, it does not necessarily follow that the Weir vehicle, if driven at a reasonable rate of speed and under control, was approaching so closely as to constitute an immediate hazard and require Roberts to yield the right of way. Broughten testified that Roberts proceeded from a stopped position. It would be highly improbable that the speed of his vehicle averaged more than fifteen miles per hour in proceeding from the driveway to the point of impact some hundred feet away. At fifteen miles an hour he would have moved twenty-two feet per second, with the result that four and a half seconds would have elapsed from the moment Roberts started to enter until he was struck. On the other hand, at sixty-five miles an hour, Broughten was moving approximately ninety-five feet per second, which, by simple calculation, would put the Weir vehicle some four hundred thirty feet to the north of the driveway when Roberts proceeded to enter the highway.

Whether under the influence, or not, Roberts, in the absence of anything which would put him on notice to the con-

trary, was entitled to assume that the Weir vehicle was being driven with due care and in accordance with law, and I do not think we would be warranted in holding, as a matter of law, that he was required to yield the right of way to a vehicle some four hundred thirty feet distant, and that his failure to do so was the proximate cause of the resulting deaths. It is, I think, clearly inferable that but for the Weir vehicle being driven at an excessive rate of speed and out of control, no collision would ever have occurred.

I am convinced of the soundness of the foregoing, even if it be conceded that Roberts did emerge from the northern driveway. Not heretofore mentioned is the fact that Broughten, in an obvious effort to explain the physical evidence showing that the entire occurrence happened on his wrong side of the highway, contended that there were two impacts between the vehicles and that the point in the highway, determined by the patrolman to, be the point of impact, was the point of the second impact, and that the first impact between the vehicles occurred at some undetermined point on the highway to the north thereof. If this testimony on his part be taken as true and particularly when considered in connection with the evidence tending to prove that Roberts entered the highway at a point south of the north driveway, it would obviously follow that the Weir vehicle was greatly more than four hundred thirty feet away when Roberts entered the highway.

The facts that Price did not see the lights on the Roberts vehicle and that there is some evidence tending to show that the left frontal portion of Roberts' vehicle was struck at a slight angle are easily explained and do not change my view as to the issue of proximate cause being for the jury. Price was driving over rolling terrain and the evidence clearly supports the inference that his view of the approaching Roberts vehicle was obscured by Weir's large tractor-trailer outfit occupying Roberts' lane of travel for an appreciable period of time prior to the impact. If it be conceded that the Roberts' vehicle was in fact struck at a slight angle, it is

only logical that Roberts would have tried to vere further to his right when he saw the Weir outfit bearing down upon him in his lane of travel, with the result of a somewhat angular impact.

In conclusion, I address my remarks to a proposition of law stated in the opinion, the soundness of which I question, and, moreover, think such unnecessary to a decision in any view of the case. The trial judge held that Roberts' administrator was bound by the allegations of his pleadings and the evidence adduced by him to the effect that Roberts was intoxicated. Such was the primary basis of the decision of the trial judge in setting the Roberts' verdict aside, and the opinion affirms such proposition of law. Not apparently called to the attention of or considered by the trial judge, however, was the dual nature of the capacities and, in this instance, conflicting duties of Roberts' administrator. He elected to assert a cross-action herein against Weir, instead of bringing a separate action for the benefit of Roberts' widow and four minor children, which, under the circumstances, of necessity, involved him taking totally inconsistent positions. While nominally the same person, he was sued by Dixon in his general capacity as administrator. The action against Weir was maintainable by him, not in his general capacity as administrator but, as the special representative of the statutory beneficiaries. *Bennett v. Spartanburg Ry., Gas & Electric Co.,* 97 S. C. 27, 81 S. E. 189; *Complete Auto Transit, Inc. v. Bass,* 229 S. C. 607, 93 S. E. (2d) 912; *Ellison v. Simmons,* 238 S. C. 364, 120 S. E. (2d) 209.

Aside from the doubtful propriety of Roberts' administrator asserting herein a cross-action, the rationale of the above cited cases would, to say the least, raise a serious question as to whether he had any right to do so, had objection been asserted. In the inconsistent positions that he took by choice, when he asserted the cross-action, it was incumbent upon him to prove, if he could, in defense of the Dixon action that Roberts was intoxicated, and that Dixon

was guilty of contributory negligence in riding with him. On the other hand, it was incumbent upon him as the special representative of the statutory beneficiaries of Roberts to prove, if he could, that Roberts was not at the time under the influence or otherwise negligent.

I seriously question the soundness of the holding that Roberts' administrator was bound in his capacity as such special representative of the statutory beneficiaries by what he had necessarily and properly done in his general capacity as administrator of the estate, which was, however, clearly adverse to the rights and interests of the statutory beneficiaries, four of whom were minors. If, as concluded in the opinion, the evidence is susceptible of no other reasonable inference than that Roberts was under the influence and that such was a proximate cause of his death, a decision as to whether Roberts' administrator was so bound is totally unnecessary to a decision of the cause. The decision of such an important issue should be left to a case where such becomes necessary.

LEWIS, J., concurs.